UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO. 3:08CV-535-S
(Electronically Filed)


CHRISTODULOS STEFANATOS STAVENS, M.D.                    PLAINTIFF


V.                    **VERIFIED COMPLAINT WITH JURY DEMAND**


JEWISH HOSPITAL & ST. MARY'S HEALTHCARE, INC.                    DEFENDANT

---

### INTRODUCTION

Dr. Christodulos Stefanatos Stavens brings this action for immediate injunctive relief and damages because his long-standing privileges to treat patients at Jewish Hospital in Louisville, Kentucky have been terminated by Defendant Jewish Hospital & St. Mary's HealthCare, Inc. ("JHSMH") in violation of Federal and Kentucky law, in violation of the JHSMH Medical Staff Bylaws, and with no opportunity for Dr. Stavens to respond to the allegations against him prior to the termination.  One consequence of this unlawful termination is that Federal law requires that the action taken against Dr. Stavens by JHSMH be reported to the National Practitioner Data Bank by October 11, 2008.  Such a report cannot be deleted when JHSMH's action is subsequently determined to be improper or unfounded.  Such a report will cause permanent and irreparable damage to Dr. Stavens' professional reputation, which will impair Dr. Stavens' ability to lead a new hospital being opened to compete with JHSMH in the Greater Louisville market.

**PARTIES**

1.      Dr. Stavens is a doctor licensed to practice medicine in the Commonwealth of Kentucky and the States of Indiana, California, Delaware, Massachusetts, New Mexico, and New York.  Dr. Stavens is board certified in Internal Medicine with a subspecialty in cardiovascular disease.  Dr. Stavens is a Fellow of the American College of Angiology, the American College of Chest Physicians, and the American College of Cardiology.  Since 1986, Dr. Stavens has been a Clinical Assistant Professor of Medicine at the University of Louisville.  Dr. Stavens was previously an Assistant Professor of Medicine at the State University of New York Downstate Medical Center in Brooklyn, New York.

2.      Dr. Stavens has been an active member of the Medical Staff of Jewish Hospital (the "Hospital") in Louisville, Kentucky since 1986.  During that time, Dr. Stavens had admitted more than 10,000 patients to the Hospital.  Prior to the unlawful termination of his privileges, Dr. Stavens served as the admitting physician for 20-30 patients to the Hospital on a daily basis. Dr. Stavens' clinical capabilities and quality of care have never been called into serious question, and he enjoys an enviable reputation in the community for high quality patient care.

3.      Dr. Stavens was born of Greek ancestry in Hawthorne, California in 1952. Dr. Stavens' family moved to Greece in 1957.  Dr. Stavens received his medical education in Greece, graduating from the University of Athens Medical School in Athens, Greece with highest honors in 1976.  Dr. Stavens returned to the United States and commenced a medical residency in this country in 1978.

4.      JHSMH is a Kentucky non-profit corporation having its principal place of business in Louisville, Kentucky.  The corporation JHSMH markets itself as part of "a regional healthcare network that includes more than 70 health care facilities and 1,900 patient beds in Kentucky and southern Indiana."  This "network" includes Clark Memorial Hospital in Jeffersonville, Indiana, a county hospital owned by Clark County, Indiana.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because JHSMH has summarily terminated Dr. Stavens' clinical privileges in violation of 15 U.S.C. § 1 and 42 U.S.C. § 1981.  This Court has jurisdiction over Dr. Stavens' claims arising under state law pursuant to 28 U.S.C. § 1367.

6.      This Court is a proper venue for this action pursuant to 28 U.S.C. § 1391 (b) because JHSMH resides in this judicial district and a substantial part of the events and omissions giving rise to Dr. Stavens' claims occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**A.      A Greek Doctor at JHSMH.**

7.      As stated hereinabove, Dr. Stavens was born in the United States of Greek ancestry.  His family moved to Greece when he was approximately five years old. Dr. Stavens grew up and received his medical education in Greece, returning to the United States permanently in 1978.

8.      Dr. Stavens has been told by JHSMH administrators that Dr. Stavens'
Greek or "Mediterranean" temperament was not what they desired in a physician
practicing at JHSMH.  JHSMH administrators have also made statements attributing Dr.
Stavens' actions in leading the establishment of the Kentuckiana Medical Center in
competition with JHSMH, described in greater detail below, to his Greek or
"Mediterranean" temperament.  JHSMH administrators have suggested to Dr. Stavens
that he would be better off returning to Greece to practice, or, at least, relocating to a
community within the United States where "ethnic behavior" is better tolerated.

9.      JHSMH administration also has subjected Dr. Stavens to adverse
treatment not inflicted on physicians who are not of Greek ancestry and ethnicity. Most
significantly, Dr. Stavens had his clinical privileges terminated for conduct less severe
than conduct by other physicians whose privileges were not terminated and who are not
of Greek ancestry and ethnicity.  Dr. Stavens has been subjected to an unauthorized
summary termination, described in detail below, which JHSMH has not imposed upon
any physicians not of Greek ancestry and ethnicity.

**B.      The Greek Doctor Becomes a Competitor.**

10.     Dr. Stavens is an investor in and a board member and leader of
Kentuckiana Medical Center, LLC ("Kentuckiana"), an Indiana limited liability company
formed for the purpose of establishing a physician-owned short-term, acute-care
hospital in southern Indiana, within the Greater Louisville market for health care
services.  The Kentuckiana hospital is scheduled to open in Clark County, Indiana in
late 2008.  The Kentuckiana hospital will compete for patients, particularly cardiac

patients, in the market served by the JHSMH network, including Jewish Hospital in Downtown Louisville and Clark Memorial Hospital.

11.     The Greater Louisville market for short-term, acute-care hospital services is composed of Bullitt, Jefferson, and Oldham counties in Kentucky and Clark, Floyd, Harrison, and Scott counties in Indiana.  The JHSMH "network" markets its hospital services throughout this geographic market.  Of the short-term, acute-care hospital beds available to the general public in the Greater Louisville market, approximately 26% are controlled by JHSMH either exclusively or by agreement with other members of the JHSMH "network," including Clark Memorial Hospital.

12.     Members of the JHSMH "network" attempted to prevent establishment of the Kentuckiana hospital by inducing the county commissions in two southern Indiana counties in which Kentuckiana was planning to locate to enact ordinances prohibiting the establishment of new hospitals within those counties.  As a result, Kentuckiana filed a lawsuit under the Federal antitrust laws and Indiana state law in the United States District Court for the Southern District of Indiana, against Clark County and Floyd County, *Kentuckiana Medical Center, LLC, et al., v. Clark County, Indiana, et al.,* Civil Action No. 4:05-cv-0086.

13.     Kentuckiana prevailed in the Indiana federal court action, and a permanent injunction prohibiting Clark and Floyd Counties and any persons acting in concert with them from enforcing those ordinances was entered by the District Court by order dated January 18, 2006.  Copies of the Complaint and the Court's Order are attached as Exhibits 1 and 2.

14.     Following entry of the permanent injunction in favor of Kentuckiana, which enabled Kentuckiana to proceed with construction of a hospital to compete with the JHSMH "network," the Chief Executive Officer of JHSMH, Robert Shircliff demanded a meeting with Dr. Stavens.  In that meeting, Mr. Shircliff expressed displeasure with the prospect of Kentuckiana hospital competing with JHSMH.  Mr. Shircliff expressed particular concern that the physician owners of Kentuckiana might sell Kentuckiana to others whom Mr. Shircliff feared could be even more effective competitors with JHSMH. Mr. Shircliff demanded that Kentuckiana grant JHSMH a right of first refusal to purchase the Kentuckiana hospital.  Dr. Stavens and Kentuckiana did not respond to Mr. Shircliff's demand for a right of first refusal.

15.     Subsequent to his meeting with Dr. Stavens, Mr. Shircliff told physicians and personnel at JHSMH that he did not want Dr. Stavens practicing at JHSMH under any circumstances.

## C.    The Competitor Dares to Criticize JHSMH

16.     On the evening of Saturday, September 6, 2008, Dr. Stavens was called to Jewish Hospital in Louisville to treat a patient who had been admitted by his partner, Dr. Satya Garimella, in a semi-comatose state, as a result of an overdose of blood pressure medication.  Appropriate consultations were obtained from other specialties (renal, pulmonary, and neurology).  The patient was intubated to assist breathing and appropriate medications were administered.

17.     The following morning, the patient was in substantially improved condition. The patient was alert, oriented, and moving all extremities.  At the request of the patient and the patient's family, the patient's breathing tube was removed Sunday morning after

blood gas results indicated the probability that it could be removed without adverse consequences for the patient.  Shortly thereafter, Dr. Stavens and Dr. Garimella left the patient's room to attend to other patients.  Dr. Stavens specifically asked a member of the nursing staff to contact him if the patient's condition changed.

18.     Sometime after Dr. Stavens and Dr. Garimella left the patient's room on Sunday, September 7, 2008, the Hospital nursing staff discontinued administration of medication which Dr. Stavens had ordered for the patient.  Shortly thereafter, the patient experienced extreme respiratory distress and the Hospital nursing staff called for emergency resuscitation (a "Code").  Dr. Stavens and Dr. Garimella were not informed that their patient was in an immediately life-threatening condition until approximately twenty minutes after the Code had been called.  Instead, the patient's treatment in the initial period of the Code was supervised by a House Physician employed by the Hospital.  During that time, the House Physician administered a medication which was inappropriate for use given the medications that the patient had taken prior to admission to the Hospital.

19.     Dr. Stavens was eventually notified of the patient's emergency situation and returned to the patient's room, where he and Dr. Garimella assumed responsibility for the resuscitation efforts.  After resuscitation efforts had continued for approximately an hour, the patient's condition had not improved.   With the express consent of the patient's immediate family, the Code was discontinued and the patient died.

20.     Following the patient's death, Dr. Stavens expressed his frustration to nursing staff members that neither he nor Dr. Garimella had been informed of the emergency more promptly, and his frustration that an improper medicine was

administered to the patient.  Both Dr. Garimella and Dr. Jason Meckler, who does not

practice with Dr. Stavens, heard comments of Dr. Stavens to the nurses and have

reported that they were delivered in a professional and measured manner.

21.     On Monday, September 8, 2008, Dr. Stavens wrote a letter to Dr. John

Derr, president of the JHSMH Medical Staff, reporting on the patient described above,

and expressing his concerns about how the emergency Code situation was handled by

Jewish Hospital staff, including the failure to timely notify either him or Dr. Garimella of

the Code and the administration of an improper medication.  At that time, Dr. Stavens

was not aware that shortly before the patient had become hypoxic and the Code had

been called, the nursing staff had also discontinued the medication that he had ordered.

Dr. Stavens was informed about that error by a member of the Hospital medical staff

shortly before his privileges were terminated.

**D.     JHSMH Retailiates in Breach of Its Own Rules**

22.     Dr. Stavens was never contacted by any representatives of JHSMH about

the contents of his letter of September 8, expressing concern about the patient's care.

Instead, Dr. Stavens was notified by letter from Dr. Derr on September 11, 2008, that

Dr. Stavens' privileges to treat patients in JHSMH facilities had been placed on

"temporary precautionary suspension."  A true and complete copy of Dr. Derr's

September 11, 2008 letter imposing a "precautionary suspension" on Dr. Stavens is

attached hereto as Exhibit 3.  The letter alleges that "[i]t has been reported that you

displayed conduct constituting a serious breach of good patient care."  The letter failed

to describe Dr. Stavens' alleged conduct, failed to state the date of Dr. Stavens' alleged

conduct, failed to identify the patient whose good care was allegedly breached, and

failed to give Dr. Stavens any information about the alleged conduct on which the "precautionary suspension" was based.

23.     Although JHSMH waited three days after Dr. Stavens' letter to Dr. Derr before imposing a suspension, no one on behalf of JHSMH attempted to get any information from Dr. Stavens before suspending him.  JHSMH also did not speak with Dr. Garimella before JHSMH imposed the precautionary suspension on Dr. Stavens.

24.     A precautionary suspension of privileges is an extraordinary sanction that is imposed upon the affected physician without any prior notice or opportunity for a hearing.  Thus, under section 6.2.1.1 of the JHSMH Medical Staff Bylaws (the "Bylaws"),[1] a precautionary suspension of privileges may only be imposed "because of a serious breach of good patient care in the Hospital" or because of a "threatened future breach of good patient care due to Physician impairment."  The Bylaws define "impairment" as "being under the influence or addicted to alcohol, drugs, or other mind-altering substances, or in a mental state or other condition which materially and adversely affects one's clinical judgment or ability."  JHSMH has never informed Dr. Stavens that it believed that he was or may have been "impaired."

25.     Dr. Stavens has been informed that his care of the patient referred to in Paragraphs 16 to 21 above, was referred to the Jewish Hospital Professional Review Committee.  Dr. Stavens is further informed that the Professional Review Committee has concluded that there had not been any breach of good patient care by Dr. Stavens with respect to his treatment of that patient.

---

[1] A true and complete copy of the Bylaws is attached hereto as Exhibit 4.

26.      Subsequent to the determination by the Professional Review Committee that there were no clinical issues regarding Dr. Stavens' treatment of the patient on September 7, 2008, Dr. Stavens received a letter from JHSMH's CEO, Mr. Shircliff, dated September 24, 2008, stating that the JHSMH Medical Executive Committee (the "MEC") had recommended termination of Dr. Stavens' clinical privileges at JHSMH. Unlike Dr. Derr's stated reason for imposing a "precautionary suspension," Mr. Shircliff's letter states that the reason for this action is events on September 7, 2008 that "evidence a pattern of behavior in violation of the Medical Staff Bylaws and Rules and Regulations." Mr. Shircliff's letter further states that "[t]he termination of your clinical privileges is effective immediately." Mr. Shircliff's letter does not describe any of the alleged "pattern of behavior" or indicate which of the Bylaws or Rules and Regulations Dr. Stavens allegedly violated. A true and complete copy of Mr. Shircliff's letter of September 24, 2008 to Dr. Stavens is attached hereto as Exhibit 5. Dr. Stavens was not informed of nor given an opportunity to respond to the allegations against him before his clinical privileges were terminated.

27.      The immediate termination of Dr. Stavens' clinical privileges was imposed in violation of the JHSMH Bylaws, which do not authorize the hospital's CEO or the MEC to revoke a physician's clinical privileges, and do not allow for the immediate termination of any physician's clinical privileges under any circumstances. Section 7.1.2 of the Bylaws states that, before such a termination may be imposed, Dr. Stavens', like any other Medical Staff member, has a right to a hearing on a recommendation to revoke his clinical privileges, and such hearing must be conducted in accord with the procedures specified in Sections 7 and 8 of the Bylaws. Under these procedures,

before JHSMH could terminate Dr. Stavens' clinical privileges, he would have been entitled to have notice of the recommendation and the reasons for it, and would have received:  (1) a hearing before a Hearing Review Panel, with a number of rights, including the right to present witnesses and evidence, and to cross-examine witnesses; (2) a hearing before the MEC, with the right to present his position, and (3) a hearing before the Board of Directors' Appellate Review Committee, with the right to be represented by counsel who could present his position.  Section 8.5 of the Bylaws provides that final action on such a recommendation may only be taken by the JHSMH Board of Directors after all of the due process procedures outlined in Section 6 and 7 of the Bylaws have been afforded to the physician.

28.     Mr. Shircliff and the MEC do not possess the authority to terminate Dr. Stavens' clinical privileges at JHSMH under any circumstances.  No person or body of JHSMH possesses the authority to terminate Dr. Stavens' clinical privileges prior to affording Dr. Stavens the hearing and appeal procedures specified in Bylaws Sections 7 and 8.

29.     Instead of complying with its Bylaws and providing Dr. Stavens with notice of the charges against him, an opportunity to present witnesses and evidence to a Hearing Review Panel, and additional hearings before the MEC and the Board's Appellate Review Committee prior to terminating his clinical privilege, Mr. Shircliff's letter immediately terminated Dr. Stavens' clinical privileges, and then after-the-fact offered to provide Dr. Stavens the Panel Review Hearing procedures that Dr. Stavens was entitled to pursue before his privileges could be revoked.

30.     By letter to Mr. Shircliff from Dr. Stavens' counsel dated September 26, 2008, Dr. Stavens requested that the hearing on the termination of his clinical privileges be conducted pursuant to Bylaws Sections 7 and 8.  Dr. Stavens requested that such a hearing be conducted promptly.  That letter also requested that the Hospital provide numerous documents, including copies of any requests for Corrective Action, the Professional Review Committee report and recommendation, records of any proceedings before the MEC or any other committee relating to Dr. Stavens, as well as copies of all statements, reports, summaries, or other documents relating to the Hospital's investigation in to the events that occurred on September 7, 2008.

31.     By letter dated October 1, 2008, delivered to Dr. Stavens' counsel on October 3, 2008, counsel for JHSMH stated that "scheduling the hearing is problematic," and no hearing has yet been scheduled.  Under the Bylaws, the earliest that such a hearing could be scheduled is October 26, 2008, and it could be scheduled as late as December 25, 2008.  The letter from JHSMH's counsel did not provide a copy of any request for Corrective Action, the final report and recommendation of the Professional Review Committee or the record of any proceedings before the MEC.  The letter also did not provide a copy of the recommendation of the MEC referenced in Mr. Shircliff's letter dated September 24, 2008, or most of the other documents requested by Dr. Stavens' counsel.

### E.    Irreparable Harm

32.    Pursuant to Bylaws Section 8.6 and 45 C.F.R. § 60.9, JHSMH must report any action that adversely affects a physician's clinical privileges for a period in excess of 30 days to the Federal National Practitioner Data Bank (the "Data Bank").  Hospitals are required to obtain information about individual physicians from the Data Bank under very common circumstances, such as when a physician seeks new or renewed privileges, 45 C.F.R. § 60.10, and various persons are permitted to obtain information about individual physicians from the Data Bank.  45 C.F.R. § 60.11.  While information reported to the Data Bank is subject to revision if the adverse action is reversed, 45 C.F.R. § 60.6(b), there is no provision in the Data Bank law and regulations to delete a report once it is made.

33.    JHSMH's "precautionary suspension" and immediate termination of Dr. Stavens' privileges will become reportable on or about October 11, 2008, well before Dr. Stavens will have an opportunity to defend himself before the Hearing Review Panel.  It is apparent that JHSMH intends for these actions to become reportable and to be reported to the Data Bank before Dr. Stavens is given the hearing and appeal procedures specified in Bylaws Sections 7 and 8, or any other meaningful opportunity to respond to the alleged basis for these actions.

34.    Under Bylaws Section 6.2.2.3, a "precautionary suspension" cannot last more than 14 days unless extended upon a determination by both the JHSMH CEO and the MEC president that "failure to continue a precautionary suspension may result in serious breach of good patient care."  Dr. Staven's "precautionary suspension" was not extended, and the grounds for extension stated in the Bylaws do not exist.  Therefore,

the "precautionary suspension" of Dr. Stavens, by itself, would not be reportable to the National Practitioners Data Bank.  Under the Bylaws, a termination of privileges is not effective and reportable until the Section 7 and 8 hearing and appeal procedures are exhausted or waived.  Dr. Stavens has exercised his right to request a hearing. However, Bylaws Section 7.4.2.1 states that such a hearing cannot be scheduled "less than thirty (30) days" after the affected physician requests a hearing.  Thus, by summarily terminating Dr. Stavens' privileges prior to a hearing, JHSMH is attempting to ensure that the termination will be reported before Dr. Stavens has his hearing.

35.     JHSMH's report to the Data Bank will, and is intended to, cause permanent and irreparable harm to Dr. Stavens' professional reputation and his ability to lead the new Kentuckiana hospital in successful competition with JHSMH.  Whether or not it is subsequently revised, JHSMH's report about Dr. Stavens will place him under permanent suspicion of being clinically and/or behaviorally incompetent to practice medicine.

## COUNT I

36.     Dr. Stavens incorporates herein by reference the matters stated in paragraphs 1 through 35 above as if specifically restated and realleged.

37.     The granting of clinical privileges by JHSMH to Dr. Stavens subject to the terms of the Bylaws constitutes a contract between JHSMH and Dr. Stavens.  This contract can only be terminated by JHSMH in accordance with the terms of the Bylaws.

38.     JHSMH's summary termination of Dr. Stavens' clinical privileges has deprived him of the benefits of this contract with JHSMH and the procedural protections that are part of that contract because of his race, ethnicity, and Greek descent in

violation of 42 U.S.C. § 1981.  JHSMH has not acted similarly against other physicians not of Dr. Stavens' race.

39.     Dr. Stavens will suffer irreparable injury unless JHSMH is temporarily, preliminarily, and permanently enjoined from implementing its summary termination of Dr. Stavens' clinical privileges.  Dr. Stavens has also suffered damages, and will suffer additional damages in the future as a direct and proximate result of JHSMH's violation of 42 U.S.C. § 1981.  Dr. Stavens is entitled to immediate injunctive relief against JHSMH to prevent irreparable harm to him, and to recover damages from JHSMH in an amount to be proven, as well as his costs and expenses, including attorneys fees incurred in this action.

### COUNT II

40.     Dr. Stavens incorporates herein by reference the matters stated in paragraphs 1 through 35 above as if specifically restated and realleged.

41.     JHSMH has conspired with Clark Memorial Hospital and others to restrain trade in the Greater Louisville market for short-term acute-care hospital services by conspiring to eliminate competition from Kentuckiana or, failing that, to impair Kentuckiana's ability to compete with JHSMH and its "network" in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

42.     Acts taken in furtherance of this conspiracy have included inducing the county commissions of Clark and Floyd counties in Indiana to enact illegal ordinances purporting to ban establishment of the Kentuckiana hospital.  After the counties were enjoined from enforcing those ordinances, Mr. Shircliff attempted to intimidate Dr.

Stavens and attempted to procure an agreement restricting the ability of Kentuckiana to transfer its hospital to anyone other than JHSMH.

43.    Before Dr. Stavens announced plans to open the Kentuckiana hospital, he and the other members of his group were recognized and valued as JHSMH staff members who admitted a large number of patients into Jewish Hospital daily.  When it became clear that JHSMH and the members of its network could not prevent the opening of Kentuckiana, Dr. Stavens was targeted by JHSMH for his leadership in forming Kentuckiana, and because JHSMH was concerned that he and his cardiology group would stop referring patients to JHSMH and would be a very important referral source for this new competitor.  By interfering and boycotting Dr. Stavens' medical practice, JHSMH and its co-conspirators are trying to impede competition from Dr. Stavens and Kentuckiana.

44.    After Mr. Shircliff failed to achieve the conspirators' goals in his meeting with Dr. Stavens, JHSMH and its co-conspirators decided to impair Kentuckiana's ability to compete with JHSMH and its "network" by injuring Dr. Stavens.  This decision has been implemented through the immediate termination of Dr. Stavens' clinical privileges at JHSMH.  This termination is calculated to impair Dr. Stavens' ability to compete with JHSMH by making JHSMH's termination of Dr. Stavens' privileges reportable to the Data Bank before Dr. Stavens is given any meaningful opportunity to contest the purported basis for that action.  JHSMH's goal is to impair competition with it and its "network" by damaging Dr. Stavens' professional reputation and by making an example of Dr. Stavens to discourage other physicians holding clinical privileges at JHSMH from

competing with JHSMH by providing medical services at Kentuckiana's hospital, or from opening new competitive hospitals.

45.     Dr. Stavens will suffer irreparable antitrust injury unless JHSMH is temporarily, preliminarily, and permanently enjoined from implementing its summary termination of Dr. Stavens' clinical privileges.  Dr. Stavens has also suffered damages, and will suffer additional damages in the future, as a direct and proximate result of JHSMH's conspiracy in restraint of trade.  Dr. Stavens is entitled to recover such damages, trebled pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and his costs and expenses, including attorney fees, incurred in this action.

## COUNT III

46.     Dr. Stavens incorporates herein by reference the matters stated in paragraphs 1 through 35 above as if specifically restated and realleged.

47.     JHSMH owes a duty to Dr. Stavens to act in accordance with the Bylaws adopted by its Medical Staff and approved by its Board of Directors.

48.     JHSMH has breached its duty to Dr. Stavens by immediately terminating his clinical privileges in bad faith and by failing to afford Dr. Stavens the fundamental due process procedures that must precede a termination of privileges under the Bylaws and under applicable Kentucky law, including Section 14 of the Kentucky Constitution.

49.     Dr. Stavens will suffer irreparable harm unless JHSMH is temporarily, preliminarily, and permanently enjoined from terminating Dr. Stavens' clinical privileges in violation of the Bylaws.  Dr. Stavens has also suffered damages, and will suffer additional damages in the future, as a direct and proximate result of JHSMH's actions in violation of the Bylaws which Dr. Stavens is entitled to recover from JHSMH.

## COUNT IV

50.    Dr. Stavens incorporates herein by reference the matters stated in paragraphs 1 through 35 above as if specifically restated and realleged.

51.    JHSMH has intentionally and improperly interfered in Dr.  Stavens' business relations with patients, and with other health care providers including physicians, nurses, and other providers who are or would otherwise practice at the Kentuckiana hospital.

52.    JHSMH's interference with Dr. Stavens' business relations is malicious in that it is motivated by racial animus; by a purpose to discredit Dr. Stavens' criticisms of care provided by JHSMH employees on September 7, 2008 in order explain JHSMH's failure to investigate such care and take corrective action against its own employees; and with the intent of injuring Dr. Stavens as a lawful competitor with JHSMH  and its "network" and to dissuade other physicians from joining Dr. Stavens in lawful competition with JHSMH and its "network."

53.    JHSMH's interference with Dr. Stavens' business relations has been accomplished by wrongful means by immediately terminating Dr. Stavens' clinical privileges without any of the procedural protections which are mandated by its own Bylaws.

54.    Dr. Stavens will suffer irreparable harm unless JHSMH is temporarily, preliminarily, and permanently enjoined from interfering with Dr. Stavens' business relations.  Dr. Stavens has also suffered damages, and will suffer additional damages in the future, as a direct and proximate result of JHSMH's interference with his business relations, which Dr. Stavens is entitled to recover from JHSMH.

**COUNT V**

55.     Dr. Stavens incorporates herein by reference the matters stated in paragraphs 1 through 35 above as if specifically restated and realleged.

56.     JHSMH has published false statements about Dr. Stavens' professional competence and behavior.  JHSMH has published these statements without exercising reasonable care to ascertain whether such statements were false by, among other things, failing to afford Dr. Stavens any meaningful opportunity to address the events upon which JHSMH's statement are purportedly based before such statements were published.

57.     JHSMH's false statements about Dr. Stavens' professional competence and behavior have caused injury to his professional reputation.

58.     Dr. Stavens will suffer irreparable harm unless JHSMH is temporarily and preliminarily restrained and enjoined from publishing false statements about Dr. Stavens' professional competence and behavior until, at least, JHSMH has followed its own due process procedures as prescribed in the Bylaws to learn the facts of the matter.

59.     Dr. Stavens has also suffered damages, and will suffer additional damages in the future, as a direct and proximate result of JHSMH's defamation, which Dr. Stavens is entitled to recover from JHSMH.

60.     JHSMH's defamation of Dr. Stavens has been done with actual malice, thereby entitling Dr. Stavens to recover punitive damages.

Wherefore, Plaintiff Christodulos Stefanatos Stavens, M.D. demands judgment against Defendant Jewish Hospital & St. Mary's HealthCare, Inc. as follows:

(A)     For orders temporarily restraining and preliminarily and permanently enjoining JHSMH from imposing or enforcing a suspension or termination of Dr. Stavens' clinical privileges prior to completion of all hearing and appeal procedures specified in Sections 7 and 8 of JHSMH's Medical Staff Bylaws;

(B)     For orders temporarily restraining and preliminarily and permanently enjoining JHSMH from publishing any statements disparaging Dr. Stavens' professional competence and behavior prior to completion of all hearing and appeal procedures specified in Sections 7 and 8 of JHSMH's Medical Staff Bylaws;

(C)     For damages, including treble damages, in amounts to be proved;

(D)     For punitive damages;

(E)     For Dr. Stavens' costs and expenses, including attorney fees; and

(F)     For such other relief to which Dr. Stavens may be entitled.

Respectfully submitted,

  /s/ Robert B. Craig
Robert B. Craig (15590)
Raymond W. Lembke (81528)
Taft Stettinius & Hollister LLP
1717 Dixie Highway, Suite 340
Covington, Kentucky  41011-4704
(859) 331-2838
(513) 381-6613 (fax)

Donald L. Cox
Lynch, Cox, Gilman & Mahan, P.S.C.
500 West Jefferson Street, Suite 2100
Louisville, Kentucky  40202
(859) 589-4215
(859) 589-4994 (fax)

Attorneys for Plaintiff
Christodulos Stefanatos Stavens, M.D.

**JURY DEMAND**

Plaintiff Christodulos Stefanatos Stavens, M.D., hereby demands a jury trial on all issues so triable.

/s/ Robert B. Craig

**VERIFICATION[2]**

COMMONWEALTH OF KENTUCKY        )
                                )        SS:
COUNTY OF JEFFERSON             )

Christodulos Stefanatos Stavens, M.D., being first duly cautioned and sworn, states that he has read the foregoing Complaint and that the statements contained therein are true to the best of his knowledge, information, and belief.

_____
Christodulos Stefanatos Stavens, M.D.

Sworn to and subscribed in my presence this ____ day of October, 2008.

_____
Notary Public

---

[2]  A copy of the signed and notarized Verification is attached as Exhibit 6.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via email and regular U.S. mail, postage prepaid, to Edward L. Schoenbaechler, Esq., Hall Render Killian Heath & Lyman, 614 West Main Street, Suite 4000, Louisville, Kentucky  40202 this 8th day of October, 2008.


 /s/ Robert B. Craig
_____